In re FOOTE MEMORIAL
HOSPITAL/PCIS
LITIGATION.

E.D.S. CORPORATION, Plaintiff,

v.

W.A. FOOTE MEMORIAL HOSPITAL,
INC., Defendant–Appellant,

First Nationwide Savings, Defendant,

Western Financial Resources, Inc.,
Lancaster Landscapes, Inc.,
Defendants–Appellees.

No. 92–2419.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 25, 1994.

Decided June 17, 1994.

Stuart Smith (argued and briefed), Gordon & Glickson, Chicago, IL, Lance T. Jones, Springfield, IL, for W.A. Foote Memorial Hosp., Inc., for defendant-appellant.

A. Stuart Tompkins, Ronald S. Lederman (argued and briefed), Sullivan, Ward, Bone, Tyler, Fiott & Asher, Southfield, MI, for Lancaster Landscapes, Inc.

Before: KEITH and RYAN, Circuit Judges; and JOHNSTONE, Senior District Judge.*

RYAN, Circuit Judge.

The district court entered summary judgment in favor of W.A. Foote Memorial Hospital on its claim that Western Financial Resources, Inc. and Lancaster Landscapes, Inc. (WFR/LLI)[1] breached their covenant of good faith and fair dealing with respect to a lease agreement. The district court refused to award Foote damages, however, on the grounds that any damages would constitute a windfall. The court also declined to award Foote attorney fees to which it claims to be contractually and statutorily entitled. The issues for decision are 1) whether the district court erred in concluding that any damages payable by WFR/LLI would constitute a windfall for Foote; and 2) whether the district court erred in not awarding attorney fees to Foote.

* The Honorable Edward H. Johnstone, Senior United States District Judge for the Western District of Kentucky, sitting by designation.

We conclude that the district court erred with respect to both issues and remand for a determination of damages.

**I.**

On October 15, 1982, Foote entered into an agreement with EDS for installation of a computerized Patient Care Information System (PCIS). As part of this agreement, EDS sold the equipment package to WFR, who in turn leased the equipment to Foote under an agreement dated July 7, 1983. Under section 10 of the lease agreement, Foote could not "assign, transfer or encumber" any rights under the lease without the "prior written consent" of the lessor, WFR. On September 16, 1983, WFR assigned its interest in the lease agreement to LLI. LLI acknowledges that WFR acted as its agent regarding the lease agreement.

During the installation and implementation of the PCIS system, various disagreements arose between EDS and Foote over failures in the operation of the system. At a meeting on February 20, 1985, the Foote Board of Trustees Finance Committee decided to abandon the EDS PCIS system and enter into a contract with Dynamic Control for a substitute system. On June 11, 1985, Foote's president, Arthur A. Knueppel, notified EDS that Foote would discontinue use of the PCIS as soon as it could obtain another system. He referred to the failed efforts to resolve the PCIS problems and the unfulfilled EDS promises. Knueppel demanded $3,140,000 in damages for the various contract breaches asserted by Foote against EDS.

Ultimately, on August 31, 1985, EDS and Foote negotiated a settlement and release agreement that required EDS to pay Foote $200,000 and assume the responsibility for the lease payments and hardware leased from WFR/LLI. The settlement required EDS to obtain the consent of the lessor (WFR/LLI) prior to EDS's assumption of the monthly lease payments and a complete release of Foote from further liability under the lease.

1. The district court treated these two parties as one entity for purposes of both liability and damages, and we continue that practice.

In the following months, EDS attempted to obtain WFR/LLI's consent for the assignment of the lease agreement contemplated by the settlement and release agreement. WFR/LLI refused to consent to the assignment unless they were paid a sum of money above and beyond that called for in the lease agreement. EDS refused to pay the extra money, and the lease was not transferred. Accordingly, the entire 1985 proposed settlement was not consummated.[2]

A number of lawsuits were filed among the parties involved in the PCIS transaction. All the cases were consolidated in the Eastern District of Michigan, where motions for summary judgment were filed. The district court referred these motions to a magistrate judge for report and recommendation. The magistrate judge determined that WFR/LLI breached the covenant of good faith and fair dealing with Foote, but did not reach the issue of damages.

After entering a judgment of liability only, in favor of Foote, the district court directed the parties to submit briefs on the issue of damages. On October 9, 1992, the district court decided that damages could be determined on the summary judgment motion papers and issued its order regarding damages, which is the basis for this appeal.

Prior to this decision, however, EDS and Foote entered into a settlement agreement which was accepted and entered by the district court on February 13, 1992. As part of the settlement, EDS agreed to pay Foote $1.1 million. Both EDS and Foote would drop all claims against each other. In addition, paragraph five of the settlement agreement specifically provided:

It is acknowledged by EDS and Foote that they intend to preserve their respective ability to continue their claims against Western Financial Resources, Inc. and Lancaster Landscapes, Inc., and EDS and Foote specifically reserve and do not release any claims they have, in the Litigation or otherwise, against Western Financial Resources, Inc. and/or Lancaster

Landscapes, Inc., including, but not limited to, Foote's right to recover lease payments from Western Financial Resources, Inc. and/or Lancaster Landscapes, Inc.

In reaching its decision on damages, the district court first decided that Foote was not entitled to recover its attorney fees from WFR/LLI. The district court also denied Foote's motion to amend its complaint to state a claim against WFR/LLI for tortious interference with the 1985 settlement agreement. The court determined that Foote was entitled to recover from WFR/LLI the lease payments it was required to make after the failure of the 1985 settlement, plus interest on those payments. Some dispute existed over the proper amount of interest to be applied, but the district court did not resolve that dispute. Instead, it assumed that the highest promulgated interest rate, 18%, was applicable. The lease payments for which WFR/LLI was responsible amounted to $532,450. At 18%, the interest was $439,-271.25. Thus, the district court found that Foote was entitled to recover, at most, $971,-721.25. The court went on to find, however, that because Foote received $1.1 million under the 1992 settlement agreement with EDS, any further recovery from WFR/LLI would constitute a windfall for Foote, as Foote received more from the 1992 settlement than it would have from the 1985 proposed settlement. Consequently, the district court refused to award damages. Thus, Foote's appeal.

## II.

This court's review of a grant of summary judgment is *de novo;* we use the same test as used by the district court. *Brooks v. American Broadcasting Cos.,* 932 F.2d 495, 500 (6th Cir.1991). In reviewing summary judgment motions, courts must view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

---

**2.** Foote argues that WFR/LLI's refusal to consent was only one reason for the failure of the proposed settlement. It also contends that EDS refused to pay the required $200,000. The rec-

ord is clear on the fact that the payment was not made, but it is not clear on why the payment was not made. We do not find it necessary to resolve this issue on appeal.

Under Fed.R.Civ.P. 56(c), summary judgment is proper if all the evidence before the district court " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)). Once the moving party has met its burden of production, the nonmoving party must go beyond the pleadings, and by affidavits, or by " 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)).

## III.

### A.

### Refusal to Award Damages

In refusing to award damages to Foote for WFR/LLI's breach of contract, the district court reasoned as follows:

> Under the "one satisfaction rule," a nonsettling defendant is entitled to a credit of the amount received as settlement with another defendant against any amount recovered against him, provided that both the settlement and judgment represent common damages.... However, the 1992 Settlement does not represent "satisfaction" of the common damage claims of Foote, such that recovery against EDS would constitute double recovery.
>
> ... Foote agrees in principle that a plaintiff should not recover a greater amount in damages for breach of an obligation than he would have received if the parties had fully performed.... However, Foote argues that its damages should not be measured against the 1992 Settlement because it does not claim WFR/LLI wrongfully prevented a settlement; but rather, that the breach of the Lease Agreement caused it to remain liable for 23 lease payments. This is a distinction without a difference.
>
> Foote remained liable for these lease payments because WFR/LLI's refusal to consent to assignment of the Lease, in breach of the Lease, prevented EDS from assuming them. Also, Foote conveniently overlooks the fact that [the] 1985 Settlement would have also released all claims against EDS, including those for which Foote received the $1.1 million. Thus, if WFR/LLI had not breached the Lease Agreement and caused the 1985 Settlement to fail, Foote could not have obtained the $1.1 million Settlement against EDS in 1992.

> . . . .

> Accordingly, the question is whether the damages requested by Foote exceed $1.1 million. The lease payments which would have been assumed by EDS total $532,-450.00. Foote seeks an award of interest as an element of damages totalling $439,-271.25, which represents 18% interest on the payments as they came due. Foote also offers two other methods for calculating the amount of interest due. However, even accepting the amounts as calculated by Foote, the lease payments and interest do not exceed the $1.1 million obtained under the 1992 Settlement. To award damages against WFR/LLI would result in a windfall to Foote.

(Citations omitted.)

Foote argues that the district court erred in measuring damages against the benefits Foote would have received from the proposed 1985 settlement and did receive from the 1992 settlement. Foote maintains that it had separate causes of action against WFR/LLI and EDS. The action against WFR/LLI arises out of the lease agreement, not the failed settlement; the claims against EDS arise out of the faulty computer system. Foote argues that it was entitled to proceed with both of these claims once the 1985 proposed settlement fell through.

In addition, Foote points to paragraph five of the 1992 settlement agreement, quoted above, which specifically provides that the agreement does not affect any rights that either EDS or Foote has against WFR/LLI. Foote states that it would not have entered into that agreement had it known that the agreement would preclude recovery against

WFR/LLI. Foote argues that the district court's action resulted in a windfall for WFR/LLI in that the company was found liable for breach of contract, but was not required to pay any damages.

According to WFR/LLI, Foote's damages should be measured against the benefits Foote would have realized under the 1985 proposed settlement agreement had it been consummated. Thus, the only measurable damages Foote should · recover are the 23 extra lease payments plus interest. Because Foote received more than this amount from EDS in the 1992 settlement, Foote is not entitled to receive any money from WFR/LLI.

WFR/LLI also claims that the "one satisfaction rule" bars any further recovery. WFR/LLI argues that the 1992 settlement agreement released EDS from "any and all Claims, of whatsoever kind or nature." According to WFR/LLI, this includes the lease payments EDS agreed to pay under the proposed 1985 settlement. WFR/LLI dismisses the limiting language of paragraph five as ·"self-serving" and not binding upon WFR/LLI, as it was not a party to the agreement.

■ The parties and the district court are in agreement with respect to the applicable law. Its application is what divides them. The basic legal principle that governs is that a plaintiff should be made whole for his injuries, but should not receive a windfall. The parties and the district court have also referred to the "one satisfaction rule," which provides that a nonsettling defendant is entitled to an offset in the amount of the settlement between a settling defendant and the plaintiff. *United States Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1236 (10th Cir.1988). A limitation upon the application of this rule, of course, is that the nonsettling defendant is only entitled to the offset if the judgment and the settlement relate to common damages. *Id.*

■ We think the district court erred in concluding, as a matter of law, that Foote may not recover from WFR/LLI a sum in damages equal to the lease payments because any such recovery would constitute a windfall for Foote. In 1985, Foote had

claims against EDS for some $3.1 million in damages for breach of contract. These claims included damages for the lease payments Foote was obligated to pay for a faulty computer system. However, the claims also included myriad other items of damage incurred by Foote because of the failed PCIS. Foote was prepared to forego litigating all of these claims in exchange for $200,000 in cash and EDS's assumption of responsibility for the lease payments. Foote did not, at the time the 1985 settlement agreement was being negotiated, have any cause of action against WFR/LLI on any theory.

The proposed settlement fell through. One reason for the failure was WFR/LLI's breach of its covenant of good faith and fair dealing by refusing to consent to the assignment of the lease. As a result of this refusal, Foote acquired a cause of action against WFR/LLI for breach of contract, damages for which would later be identified as a sum equal to the lease payments which EDS would have assumed under the 1985 proposed settlement. At that point the proposed 1985 settlement with EDS became a nonevent.

Shortly after the failure of the 1985 proposed settlement, Foote instigated litigation against EDS. Foote maintains that its damages against EDS continued to mount over the years; by 1992, the damages amounted to more than $6 million. The $6 million figure is an aggregate damage amount for a host of claims Foote had against EDS arising from the faulty PCIS. One of Foote's claims, but only one, was its claim for the cost of 23 lease payments it was required to make for the allegedly useless computer system. In addition to its claims against EDS, Foote also had its claim against WFR/LLI for breach of the covenant of good faith and fair dealing contained in the lease agreement. Foote had also instigated litigation on this claim and by 1992 had won a summary judgment motion against WFR/LLI on the issue of liability.

Before the district court reached a final resolution on the claims between Foote and EDS, Foote agreed to forego prosecution of its myriad claims in consideration for $1.1 million. We agree with the district court's

finding that this settlement does not represent "satisfaction" of the common damages claims. We cannot, however, agree with the district court's holding that any recovery from WFR/LLI would constitute a windfall for Foote. While it is true that Foote would probably not have been able to negotiate the 1992 settlement absent WFR/LLI's breach of contract, it is not true that the 1992 settlement left Foote better off than it would have been under the 1985 proposed settlement.

Our disagreement with the district court rests on two bases. First, the district court's holding depends on the assumption that Foote's non-lease claims remained static. As we mentioned earlier, Foote had a number of claims against EDS in addition to the remaining lease payments Foote was obligated to make. Foote argues that its damages claims almost doubled from 1985 to 1992.

Second, the district court's analysis failed to account for the full value of the 1985 proposed settlement. The district court's opinion discussed only the remaining lease payments and the interest on those payments. It did not recognize that the proposed settlement also required EDS to make a $200,000 lump sum payment. The full value of the proposed settlement cannot be calculated without accounting for the lump sum payment plus interest. When the increased damages are added to the lump sum payment plus interest, it rapidly becomes clear that Foote would not receive a windfall if it were to recover from WFR/LLI the lease payments plus interest. Thus, the district court erred in refusing to award damages to Foote.

### B.

### Attorney Fees

In denying Foote's request for attorney fees, the district court stated:

Foote claims it is entitled to an award of attorneys' fees and costs under Paragraph 9(b) of the Lease Agreement.... Foote is correct that § 1717 creates a reciprocal fees provision, no matter how unilateral the wording, and makes a provision for attorneys' fees apply to the entire contract....

However, by its terms, the statute only applies to contract actions where the contract specifically provides for an award of attorneys' fees and costs. Cal. Civil Code § 1717(a). While Paragraph 9(b)(iii) of the Lease mentions "reasonable attorney's fees and other legal expenses," it does not provide for an award of attorney fees and costs. Rather, Paragraph 9(b)(iii) provides for liquidated damages following default, in the amount by which 9(b)(iii)(A) exceeds 9(b)(iii)(B) and attorneys' fees and costs incurred by the lessor are one of the four elements included in the equation under subpart (A).

... Therefore, Foote is not entitled to an award of attorneys' fees and costs.

(Citations omitted.)

■■ Ordinarily, each litigant must pay his own attorney fees. Fees are available only if authorized by statute or an enforceable contract. *See United States v. Callahan,* 884 F.2d 1180, 1185 (9th Cir.1989), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990). The lease agreement entered into by Foote and WFR is governed by California law. The starting point for this analysis, then, is whether California has any applicable statutes. Foote invites our attention to a California statute, which provides in pertinent part:

(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

Where a contract provides for attorney's fees, as set forth above, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract.

Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit.[3]

Cal.Civ.Code § 1717 (West 1993) (footnote added).

Foote then looks to the lease agreement, which is governed by California law, and argues that the lease contains a provision permitting WFR/LLI to recover attorney fees in the event of a default. The lease agreement states in pertinent part:

9. Events of Default

. . . .

(b) With or without terminating this Lease, upon the occurrence of any of the above events of default, Lessor may, at its option, exercise any one or more of the following rights: (i) proceed by appropriate court action or actions to enforce performance by Lessee of the applicable covenants and terms of this Lease or to recover damages for the breach thereof; (ii) repossess any or all units of Equipment without prejudice to any remedy or claim hereinafter referred to; (iii) after giving 10 days' notice to Lessee, elect to sell any, all or no units of Equipment at one or more public or private sales, or lease any, all or no units of Equipment, and recover from Lessee as liquidated damages for Lessee's default hereunder an amount equal to the amount, if any, by which (A) the sum of (1) all rent theretofore and thereafter payable hereunder (except rent theretofore paid by Lessee), (2) all costs and expenses incurred in locating, removing, storing, repairing, restoring and selling or leasing such units of Equipment, (3) all other amounts owing by Lessee hereunder, and (4) all costs and expenses, including (without limitation) reasonable attorney's fees and other legal expenses, incurred by Lessor as a result of Lessee's default hereunder, exceeds (B) the amount (discounted to present value, as to any Equipment so leased by Lessor) received by Lessor upon such public or private sales, or such leases, of such units of Equipment. . . .

Foote argues that the statute makes this provision reciprocal, and Foote should therefore recover its attorney fees incurred due to WFR/LLI's breach.

WFR/LLI argues that section 1717 does not apply because the lease only provides for attorney fees as a small part of a calculation of liquidated damages. This argument, however, must be rejected in light of the second paragraph of the statute and case law interpreting that paragraph. The lease agreement does not specify that the parties were represented by counsel during the negotiation and execution of the lease. Consequently, paragraph two applies. That paragraph explicitly states that an attorney fees provision in any part of the contract "shall be construed as applying to the entire contract." A California court has held that this portion of the statute was adopted specifically to disallow the type of restrictive interpretation advanced by WFR/LLI. Apparently, California courts had accepted this argument, causing the Legislature to amend the statute. *Boyd v. Oscar Fisher Co.,* 210 Cal.App.3d 368, 258 Cal.Rptr. 473, 479 (1989).

*Boyd* concerned a contract between a manufacturer and a dealer who marketed the manufacturer's products. The terms of the contract between the two companies limited the recovery of attorney fees to the efforts of the manufacturer to collect unpaid invoice amounts. The California appellate court, however, refused to enforce these limitations in light of the second paragraph of section 1717.

The district court found that the lease did not provide for an award of attorney fees and costs, but rather included these amounts as part of liquidated damages. We think the district court's interpretation of the lease is too restrictive. The decisions by the California courts show that section 1717 should be interpreted broadly. Consequently, Foote is entitled to attorney fees under the lease.

---

3. This court need not determine whether this is the version of the statute in force at the time the lease in question was executed. California law provides that the current version of the statute be applied, rather than any version which was in effect at an earlier stage of the contractual relationship or court proceeding. *See Boyd v. Oscar Fisher Co.,* 210 Cal.App.3d 368, 258 Cal.Rptr. 473, 477, 479 (1989).

## IV.

In view of our disposition of the foregoing issues, there is no occasion to reach the remaining issues raised by Foote.

We **REVERSE** the decision of the district court both with respect to damages and attorney fees, and we **REMAND** the case to the district court for a determination of damages and attorney fees.